Filed 12/31/25  P. v. Lake CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084548 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274161, SCD274161-02) |
| DARIUS LAKE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Darius Lake appeals the trial court's denial of his motion for mental health diversion (Pen. Code,[1] § 1001.36) following his conviction on 10 counts of robbery and one count of attempted robbery. The court found that defendant satisfied the statutory eligibility criteria and three of the four statutory suitability requirements. But the court found that Lake did not satisfy the final suitability criterion because he "poses a tremendous threat to public safety" if treated in the community. Because substantial evidence supports this finding, we conclude the court acted within its discretion in denying diversion. Accordingly, we affirm the judgment.

# II. BACKGROUND

## A. The Underlying Convictions[2]

"A jury convicted defendant of 10 robberies and one attempted robbery that he committed at five banks." (*Lake I, supra*, D074304.) "All robberies occurred in 2017." (*Ibid*.)

"On October 5, defendant approached bank teller Reema D. at the Bank of the West in El Cajon and demanded money. He threatened to kill her. Reema gave defendant the money in her first drawer. He demanded '100's,' and she gave him about $5,000 from her second drawer. Defendant took the money, put it in a bag he was carrying, and ran out the door." (*Lake I, supra*, D074304.)

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    We base our summary of facts regarding defendant's underlying convictions on this court's opinion affirming those convictions. (See *People v. Lake* (July 22, 2020, D074304) [nonpub. opn.] (*Lake I*).)

"Defendant entered the Pacific Western Bank in San Diego on October 12. He first approached bank employee Christopher O. and demanded money, which Christopher turned over. Defendant demanded more — '100's' — but Christopher said he had no more. Defendant then went to employee Carlos F. and demanded '100's.' Carlos F. gave defendant money from his drawer, which defendant put in his bag. The employees estimated that defendant took about $1,560 in all." (*Lake I, supra*, D074304.)

"On October 14, defendant went into the Navy Federal Credit Union in San Marcos. He went first to Kristine E., a greeter, and demanded '100's' from her, threatening to kill people in the bank. Kristine told him there was no money at her station. He next went to Jennine S., a teller, and demanded '100's' from her. She gave him all the money in her drawer. He then went to Tiffany G., also a teller, screaming for her to give him her money. She complied, giving him about $2,900. Jason A. was at Tiffany's station, depositing $1,400 in cash. He heard defendant demanding '100's.' Defendant took Jason's money, too." (*Lake I, supra*, D074304.)

"Defendant and another man went into the Mission Federal Credit Union on October 19. Defendant demanded money from teller Pamela G. while the other man demanded money from teller Babe Y. Babe handed over cash to the robber. Wolf K., a customer, was at Pamela's station. He had put $300 on the counter for deposit into his account. Defendant walked up, demanded his money, and took it. Pamela thought the robbery was a joke at first and did not provide all her money. Defendant became hostile and aggressive, yelling at Pamela that he wanted her '100's.' Defendant jumped on top of the counter, grabbed her cash drawer, and took the money from it." (*Lake I, supra*, D074304.)

3

"On October 27, defendant demanded 'large bills' from employee Jessica A. at the Navy Federal Credit Union in Chula Vista. She gave him all the cash she had, about $2,500." (*Lake I*, *supra*, D074304.)

Defendant was arrested "days after the last robbery. Officers searched defendant's phone pursuant to a search warrant and found photos and a video of defendant flashing large amounts of cash during the time when the string of robberies occurred. An FBI officer . . . explained that the FBI dubbed defendant 'the chameleon bandit' because he kept changing clothes for each robbery." (*Lake I*, *supra*, D074304.)

"Officers questioned defendant after he was advised of and waived his rights. . . . Defendant said he had been released from federal custody in August 2017 after serving about five years for prior bank robberies. . . . He eventually admitted having robbed the banks [in the current case]. The officer told defendant that he was called 'the chameleon.' Defendant laughed and said, 'I love that s--t. . . . I also wanted to be ["]the clean getaway bandit.["] ' Defendant said he lost track of how much money he had taken, and that he had spent the money having fun. The officer asked defendant about each robbery and defendant said he remembered each one." (*Lake I*, *supra*, D074304.)

After the jury convicted defendant, he "waived his right to a jury trial on his prior convictions. The trial court found true that he had three prior felony convictions for robbing banks. Those were serious felony convictions [citations] and strike convictions [citations] under California law." (*Lake I*, *supra*, D074304.)

"The court sentenced defendant on June 15, 2018, to a determinate term of 25 years, consisting of five consecutive terms of five years each for the prior serious felony conviction, and a consecutive indeterminate term of

4

125 years to life, consisting of five consecutive third-strike terms of 25 years to life." (*Lake I*, *supra*, D074304.)

## B. The Previous Appeals

Defendant appealed his convictions, "rais[ing] claims about jury selection and prosecutorial error during closing argument." (*Lake I*, *supra*, D074304.) This court rejected those claims but "remand[ed] the case for the court to consider its discretion in imposing enhancements for the prior serious felony, pursuant to a new law that became effective during the pendency of [that] appeal." (*Ibid.*)

"After the case was remanded, the trial court . . . notified the parties it intended to strike the five-year enhancements from [defendant]'s prison term." (*People v. Lake* (Apr. 20, 2022, D078734) [nonpub. opn.] (*Lake II*).) Defendant's counsel advised the court that he "intended to evaluate the case for a potential motion for diversion" under section 1001.36, which "took effect after [defendant] was sentenced." (*Ibid.*) "The prosecutor agreed the court should strike the enhancements. On February 9, 2021, the trial court issued an ex parte order striking the five-year enhancements and declining to address [defendant]'s eligibility for diversion as beyond the scope of the remand." (*Ibid.*) Defendant "then sent a letter to the trial court asking it to recall the sentence because the court had resentenced him in his and his counsel's absence and had denied his ability to seek diversion. The court denied the motion without prejudice in a March 18, 2021 order that stated the court would grant the motion to recall provided counsel filed a motion for diversion by May 21. Before that deadline, [defendant] instead filed a notice of appeal from the 'resentencing on remand.' " (*Ibid.*)

5

On appeal, this court rejected defendant's claims regarding the resentencing but conditionally reversed the judgment to give defendant the opportunity to seek mental health diversion. (*Lake II*, *supra*, D078734.)

### C. The Motion for Mental Health Diversion

Following the conditional reversal and remand, defendant filed a motion for mental health diversion under section 1001.36. The People opposed the motion. The trial court found that defendant was eligible for diversion but was not suitable because he posed an unreasonable risk of danger to public safety if treated in the community. We discuss these proceedings in greater detail in part III.B., *post*.

## III. DISCUSSION

### A. Mental Health Diversion Framework

Initially enacted in 2018, section 1001.36 "authorizes a pretrial diversion program for defendants with qualifying mental disorders." (*People v. Frahs* (2020) 9 Cal.5th 618, 626.) "Diversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*); see § 1001.36, subd. (f)(1).)

To qualify for diversion, a defendant must be "both *eligible* for diversion and *suitable* for the program." (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.) A defendant is eligible for diversion if two criteria are met. First, the defendant must be diagnosed with a qualifying mental disorder, defined as a disorder "identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders [(DSM)] . . . , but excluding antisocial personality disorder and pedophilia." (§ 1001.36, subd. (b)(1).) Second, the mental disorder must have been "a significant factor in the commission of the

6

charged offense." (*Id.*, subd. (b)(2).) There is a statutory "presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime." (*Sarmiento*, at p. 891; see § 1001.36, subd. (b)(2) ["If the defendant has been diagnosed with a mental disorder, the court *shall* find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence" to the contrary (italics added)].) "If the defendant meets the two enumerated eligibility requirements, 'the court must consider whether the defendant is suitable for pretrial diversion.' " (*People v. Brown* (2024) 101 Cal.App.5th 113, 120, quoting § 1001.36, subd. (b)(2).)

A defendant is suitable for pretrial diversion if four criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder . . . would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).) A defendant poses an " 'unreasonable risk of danger to public safety' " if there is "an unreasonable risk" the defendant will commit a new violent felony, known as a super strike, within the meaning of section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c); see *Sarmiento*, *supra*, 98 Cal.App.5th at p. 892.)

"Assuming the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment

7

needs of the defendant.' " (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (f)(1)(A)(i).)

"Finally, even where defendants make a prima facie showing that they meet all the express statutory requirements, the court may still exercise its discretion to deny diversion. [Citations.] But this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.] That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Sarmiento*, *supra*, 98 Cal.App.5th at pp. 892–893.)

" 'Ultimately, . . . diversion under section 1001.36 is discretionary,' . . . and we 'review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887.) We review the trial court's factual findings for substantial evidence. (*Negron v. Superior Court* (2021) 70 Cal.App.5th 1007, 1016; see *Qualkinbush*, at p. 887 [" ' "A court abuses its discretion when it . . . bases its decision on express or implied factual findings that are not supported by substantial evidence." ' "].)

## B. Trial Court Proceedings

### 1. Defendant's Motion

As noted, defendant moved for mental health diversion under section 1001.36. He supported the motion with the *Lake I* opinion, the probation

report from his 2018 sentencing, and a psychological report prepared by Dr. Kristina J. Malek, Ph.D.

The probation report detailed defendant's criminal history, which included a juvenile adjudication for possessing marijuana. Defendant was granted diversion but failed to comply three times. His adult record included convictions for furnishing alcohol to a minor, drug possession, fighting in public, burglary, grand theft, and bank robbery (during which defendant told the victim, " 'I have a gun. I will hurt everyone.' "). Defendant was unsuccessful in a 2010 diversion connected to a drug offense. The probation report also documented defendant's drug use dating back to adolescence.

Dr. Malek concluded in her report that defendant satisfied the criteria for mental health diversion. She based her opinions on a two-hour "Webex video conference" interview of then-33-year-old defendant, and her review of defendant's legal, medical, and mental health records. Because she "did not conduct an in-person interview, no psychological testing was administered."

Dr. Malek diagnosed defendant with several mental health conditions listed in the most recent version of the DSM, including complex trauma and several substance use disorders. Defendant's complex trauma dated back to his difficult childhood, which included his mother revealing to him that "he was a product of rape and bore a striking resemblance to the perpetrator of this heinous act against her." Defendant had no contact with his father after age seven or eight, when the mother moved the family to San Diego. Defendant had an unstructured home environment, which included a bipolar mother and older siblings who used drugs. Defendant was 22 years old when he committed the bank robberies that led to a conviction in federal court and a five-year sentence that ended in August 2017. Defendant was initially released six months early into a residential drug abuse program, but he

relapsed and was returned to custody. Defendant committed the underlying offenses in this case about two months after his release from federal prison, while he was still on parole.

Dr. Malek observed defendant had "a lengthy and significant history of substance abuse" that began with cigarettes and alcohol at age 11, progressed to smoking marijuana at 13, using PCP at 14, and experimenting with MDMA at 16. Defendant used heroin, including intravenously, while in federal prison.

Dr. Malek also opined that defendant's mental health conditions — "his struggles with alcohol and drug abuse," in particular — "played a significant role in his involvement in the 2017 robberies" at issue here. Dr. Malek stated "there are several empirically validated treatment approaches that can effectively address both [defendant's] substance use problems and his history of trauma." She further posited there were community-based programs that could meet defendant's specialized treatment needs. Finally, Dr. Malek asserted she had "no information to suggest" that defendant would pose an unreasonable risk of danger to public safety if treated in the community.

### 2. The People's Opposition

The People opposed defendant's motion. Preliminarily, the People argued it was "unclear whether defendant suffers from a [qualifying] mental disorder" because information about his background contained in Dr. Malek's report was not contained in the probation report. Next, the People argued "defendant's mental disorder did not play a significant role in the commission of the offense[s]" because the record showed he "was a seasoned convicted bank robber" who committed the robberies primarily for financial gain and also because he "enjoyed the challenge and thrill of robbing banks," as

10

evidenced by his pleasure in learning he had earned a nickname (though not his preferred one).

The People also argued extensively that defendant would pose an unreasonable risk of danger to public safety if diverted to mental health treatment in the community. The People cited defendant's issuance of death threats during two of the robberies; his ordering of victims to the ground, "where they were vulnerable, obscured, and isolated from being helped by witnesses"; and the general trauma suffered by the victims due to the aggressive yelling of commands during the robberies. The People acknowledged that defendant's movement of victims to the floor did not rise to the level of kidnapping for robbery — a super strike offense (§§ 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv), 209, subd. (b)(1)) — but noted that the court could consider the proximity of defendant's conduct to that offense for purposes of assessing the likelihood he would commit a super strike offense if treated in the community.

Finally, the People argued that even if defendant were otherwise eligible and suitable for diversion, the trial court should exercise its residual discretion to deny diversion because (1) defendant "was in control of his faculties when he committed the offenses"; (2) he recruited and acted in concert with an accomplice; (3) the robberies were planned and sophisticated, "rather than impulsive[]"; (4) defendant committed the robberies in an "aggressive" manner that "terrified the victims"; (5) defendant was unable to remain law-abiding while on parole; and (6) defendant failed when previously offered diversion.

### 3. Defendant's Reply

In reply, defendant argued the trial court should grant him diversion because he had never received proper treatment for his diagnosed conditions

and because granting diversion would be "consistent with the principles and purposes of the mental health diversion law." Defendant submitted with his reply brief a letter from a county social worker listing available treatment services consistent with Dr. Malek's recommended treatment.

### 4. The Trial Court's Ruling

After hearing argument, the trial court denied defendant's motion for mental health diversion. The trial court prefaced its ruling by identifying the materials it reviewed, which included "the entire court file," "the transcript of the trial," the motion papers, "over a thousand pages" of defendant's treatment records for care received while in custody, and relevant case law.

The court also heard from defendant. Defendant recounted his unstable childhood, the bad influences he encountered in his social circles, and the progress he had made while in custody.

The trial court began its ruling by identifying shortcomings in the record. The court found it "interesting that there's considerable information in Dr. Malek's report that was provided by [defendant], some of which is inconsistent with what he told the probation officer." The court also noted the lack of information corroborating defendant's statements about his living environment following his release from federal prison.

The court also observed that Dr. Malek reported that defendant "participated in treatment throughout his time in prison," which included cognitive behavioral therapy and substance abuse treatment. Although the court noted defendant's unsuccessful attempt at diversion as a young adult, the court found it was "of no consequence" because "it was so long ago."

Ultimately, the trial court accepted Dr. Malek's opinions that the diversion eligibility requirements were satisfied. First, the court cited Dr. Malek's diagnosis of defendant with a mental condition identified in the

12

DSM.  The court noted, however, that the diagnosis was based on a remote interview and available records.  The court also observed that Dr. Malek indicated that defendant's records showed he had been diagnosed with various conditions while in custody, but that there was "no report from whoever made the diagnosis and what testing might have been done at that time."  Although the court found "a lot of conflicts" between what defendant "told Dr. Malek and what was in the probation report," there was "no doubt in the court's mind that" defendant met this criterion.

Second, the court relied on Dr. Malek's opinion in finding that defendant's "mental disorder [was] a significant factor in the commission of the charged criminal offense."  Although the court made this finding, the court admitted it was "on the fence" about it because the court — having presided over the trial — did not believe "it was that much of a significant factor."  Instead, the court suspected defendant was "motivated by two things" — "he wanted money" and "all the evidence is that [he] liked the thrill of the situation."

Turning to the suitability criteria, the trial court recited Dr. Malek's findings that defendant would respond to suitable treatment and that such treatment was available in the community.  And there was "no doubt in the court's mind that [defendant] would prefer to have mental health diversion."

The court viewed the final suitability factor — whether defendant would pose an unreasonable risk of danger to public safety if treated in the community — as "the real issue in this case."  The court observed that while Dr. Malek "indicate[d] that she ha[d] no information to suggest" that defendant had ever committed a super strike offense, she did not "comment about the threats that were made to the tellers during the course of these robberies," which the trial court "heard a lot of evidence about . . . during the

13

trial." That said, the court acknowledged that defendant did not use a weapon during the robberies, he did not physically harm any of the victims, and he did "not have a significant history of violence."

The court addressed the People's argument that although defendant's conduct did not constitute a super strike offense, the court could consider the similarity to a super strike of his conduct. The court acknowledged that defendant's movement of his victims during the robberies was insufficient to constitute the super strike offense of kidnapping for robbery, but the court said it was nevertheless "analyzing the proximity of the defendant's actual conduct to a super strike offense." In this respect, the court noted that defendant made death threats during two robberies, threw items, and "traumatized victims by ordering them to the ground . . . where they were vulnerable, obscured, [and] isolated from being helped by witnesses."

The court ultimately found that defendant was not suitable for mental health diversion because he posed an unreasonable risk of danger to public safety if treated in the community.[3]

### C. Analysis

As in the trial court, "the real issue in this case" on appeal is whether substantial evidence supports the trial court's finding that defendant would pose an unreasonable risk of danger to public safety — that is, that he was likely to commit a super strike offense — if treated in the community. We conclude that substantial evidence supports this finding.

---

[3]    Although the trial court, at times, suggested that it found defendant both eligible and suitable, the trial court's focus — and the parties' focus on appeal — on whether defendant posed an unreasonable risk of danger to public safety if treated in the community suggests to us that the trial court found defendant did not meet this suitability requirement.

14

The trial court tethered its analysis to the statutory suitability criteria by expressly "analyzing the proximity of defendant's actual conduct to [the] super strike offense" of kidnapping for robbery. Although the court acknowledged that defendant was unarmed and never physically injured anyone during any of the robberies, the court cited defendant's issuance of death threats, his recruitment of an accomplice with whom he acted in concert, and defendant's commanding of victims onto the floor, where they were "vulnerable, obscured, [and] isolated from being helped by witnesses." (Cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 886 [describing the defendant's attempted robbery as "hand[ing] a liquor store clerk a note written in lipstick on a napkin saying, 'Let me get the money,' " which led one store employee to testify, " '[i]t looked like she wanted us to call the police' "].)

Although we find it a close question, we conclude that defendant's pattern of committing bank robberies during which he routinely terrorized his victims constitutes substantial evidence to support the trial court's finding that there was a reasonable likelihood that, if treated in the community, defendant would commit the super strike offense of kidnapping for robbery. (Cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 897 [finding the trial court abused its residual discretion to deny mental health diversion where the court's finding that the defendant posed a risk to public safety was not tethered to the statutory requirement that the risk to public safety arise from the likelihood that the defendant will commit a super strike offense].) The fact that defendant had not previously committed this offense did not preclude the trial court from finding that he is likely to do so in the future. (See *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214.)

Because the trial court's finding is supported by substantial evidence, we find no abuse of discretion in the trial court's denial of defendant's motion for mental health diversion.

## IV.  DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:


DATO, Acting P. J.


KELETY, J.